THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| ROBERT FRYE et al., <br><br> Plaintiff, <br><br> v. <br><br> THE BIRO MANUFACTURING <br><br> COMPANY et al., <br><br> Defendants. | CASE NO. C10-0192-JCC <br><br> ORDER |

This matter comes before the Court on the second motion for summary judgment of Defendants The Biro Manufacturing Company *et al*. (Dkt. No. 117), Plaintiff's response (Dkt. No. 121), and Defendants' reply (Dkt. No. 125). Having thoroughly considered the parties' briefing and the relevant record, the Court finds oral argument unnecessary and hereby denies the motion for the reasons explained herein.

**I.      BACKGROUND**

After his arm was severed by a meat grinder, Plaintiff Robert Frye and dependant family members brought this action against the manufacturer of the meat grinder. Plaintiff argues, *inter alia,* that the grinder was defectively manufactured because it was equipped with a safety guard that was easily removable. Defendant contends that the grinder complied with manufacturing

ORDER
PAGE - 1

specifications and that removable components were not installed on the machine until after the time of delivery.

To begin, some description of the meat grinder is necessary. The grinder consists of a hopper and a base. The base contains the motor, the grinding auger that chops up the meat, and the meat output. The hopper attaches on top of the base. The hopper looks like a large rectangular sink with a hole in the middle that leads to the auger. Like a large food disposal, meat is pushed into the hole to be ground up by the auger. The safety guard attaches to the hopper and over the hole to protect the operator from coming into contact with the auger. The guard on this grinder was attached using a set of wing-nut fasteners. Because these fasteners allow the guard to be easily removed, they are the main subject of this litigation.

Defendants have used various methods to fasten the guard to the hopper during the production history of the grinder. Originally, guards were affixed with driven screws. (Dkt. No. 121 at 3.) In the 1960s, the driven screws were replaced with irreversible screws. In 1972, the screws were replaced with welded bolts. The design for the subject grinder called for irreversible/non-removable screws. Defendants contend that the wing-nut fasteners found on the safety guard were never part of the design of any grinder. (Dkt. No. 117 at 13.) Nevertheless, the safety guard was not attached to the grinder when Plaintiff was injured.

On the day of the accident, Plaintiff was making meat loaf by mixing pork and onions with the grinder. While Plaintiff attempted to clear some onions from the grinder, his hand became caught in the spinning auger and was drawn into the machine resulting in the amputation of his arm below the elbow. Plaintiff states that the amputation occurred so quickly that he did not feel pain or know what had happened until he saw that his hand and arm were missing. (Dkt. No. 121 at 2.)

Plaintiff claims that the use of the wing-nut fasteners constitutes a manufacturing defect because the machine deviated from the design specifications. (Dkt. No. 121 at 6.) Plaintiff has produced declarations by each of the grinder's owners stating that the safety guard's fasteners

were never modified. (Dkt. No. 121 at 3.) Additionally, Plaintiff points to expert testimony that concludes, after x-raying the guard, that there were no indications that the guard had been modified. (*Id*.) Plaintiff's expert also highlights the lack of any tool marks or gouges in the underside of the hopper as an indication that the guard had not been modified. (*Id*.)

Defendants contend that the guard must have been modified at some time after it was delivered because the installation of the wing-nuts would require concerted effort and the installation of additional parts that were not part of the regular manufacturing process. (Dkt. No. 117 at 3). Defendants present competing expert testimony and a demonstration video that state that the screws could have been removed without leaving marks on the underside of the hopper. (Dkt. No. 120 at 20.) Defendants' expert also claims that the x-rays conducted by Plaintiffs' expert were of too poor a quality to draw a conclusion and concludes that the guard was modified after it was delivered to the customer. (Dkt. No. 117 at 14.)

## II.     DISCUSSION

Summary judgment is proper "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must view all evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248–50 (1986). A genuine issue of material fact exists where there is sufficient evidence for a reasonable fact finder to find for the nonmoving party. *Id.* at 248. The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

### A.     WPLA

The Washington Products Liability Act ("WPLA") provides that "a product is not reasonably safe in construction if, when the product left the control of the manufacturer, the product deviated in some material way from the design specifications." RCW § 7.72.030(2)(a). A claim brought under this provision is commonly called a manufacturing defect claim. The case

law for manufacturing defect recognizes that a manufacturer is liable if the defect results from a failure in the manufacturing process to deliver the product as intended. *See e.g.*, *Johnson v. Recreational Equip., Inc.*, 159 Wash. App. 939, 943, 247 P.3d 18 (2011) (carbon fiber fork on bicycle had insufficient epoxy causing cracks and subsequent failure).

Defendants ask the Court to recognize two categories of manufacturing defect cases. The first category is cases where some flaw in the manufacturing process creates an unintentional deviation in a standard product - such as a soda bottle with an area of thin glass. (Dkt. No. 117 at 16.) The second category are cases where the deviation does not the result from some hidden flaw in the manufacturing process but rather is the result of intentional action on the part of the manufacturer – such as the addition of new or different part. The classic manufacturing defect cases have fallen in the first category.

Defendants' primary argument is that a claim outside of the first category must therefore fall outside of the scope of the WPLA. Defendant argues that because the addition on the removable wing-nuts would require additional design changes and intentional action of the part of the manufacturer, the Plaintiff's claim falls into the second category and fails as a matter of law. (*Id.* at 18.)

The Court disagrees with this reading of the WPLA because it does not follow from the plain language of the statute. The WPLA does not require Plaintiff to show (a) how the product came to deviate from the design, (b) that the deviation was the result of some mechanical error, or (c) that the deviation was not the result of an intentional action; it only requires the Plaintiff to show that "when the product left the control of the manufacturer, the product deviated in some material way from the design specifications." RCW § 7.72.030(2)(a). This deviation can be from a physical flaw or from incorrect assembly. *See* Restatement (Third) of Torts § 2 (comment) ("[c]ommon examples of manufacturing defects are products that are physically flawed, damaged, or incorrectly assembled."); *Wiseman v. Goodyear Tire & Rubber Co.*, 29 Wash. App.

ORDER
PAGE - 4

883, 886, 631 P.2d 976, 978 (1981) (stating that some manufacturing defects result when an individual product is improperly assembled).

In this case, the fact remains that the safety guard materially deviated from the design specifications. Requiring the Plaintiff to discover exactly how the manufacturer produced the deviation or to produce evidence that the wing-nuts were not the result of intentional action would hold the Plaintiff to an artificial distinction that does not follow from the WPLA. Therefore, this claim is not barred as matter of law.

### B. Battling Experts Leave Questions of Fact

The question remains whether a reasonable jury could come to the conclusion that the safety guard was altered during manufacturing. The Court does not believe that the evidence is so one-sided that Defendants must prevail as a matter of law. As discussed above, there are genuine issues of material fact as to when and how the safety guard came to deviate from the design specification.

Taking all inferences in favor of the Plaintiff the Court is not convinced by Defendants' position that it is impossible that the grinder was manufactured with a wing-nut assembly. Experts disagree as to whether the guard was modified and Defendants have used different assembly methods through the production history of the grinder. From the evidence presented, it is reasonable to infer that the guard was manufactured with the wing-nuts. For example, the Court could infer that Defendants ran out of irreversible screws and replaced them with wing-nuts on this particular machine - how, when, and where the wing-nuts were added to the safety guard are all questions of fact that should be left to the jury.

Therefore, the Court denies summary judgment for Defendants because there are genuine issues of material fact that render summary judgment inappropriate.

### III. CONCLUSION

For the foregoing reasons, Defendants' second motion for summary judgment (Dkt. No. 117) is DENIED. Plaintiff's objections to Defendants' expert testimony and evidence will be

considered, if necessary, before trial.

DATED this 2nd day of December 2011.

John C. Coughenour
UNITED STATES DISTRICT JUDGE